**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| AMERICAN BOTTOM CONSERVANCY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL NO. 09-603-GPM |
| ) | |
| UNITED STATES ARMY CORPS OF ) | |
| ENGINEERS; COL. THOMAS E. O'HARA, ) | |
| JR.; and WASTE MANAGEMENT OF ) | |
| ILLINOIS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

**MURPHY, District Judge:**

Plaintiff American Bottom Conservancy (ABC) is a not-for-profit corporation dedicated to the preservation of the environment in the metropolitan area known as the "Metro East."[1] In this case, ABC challenges – under the Administrative Procedure Act (APA) – a permit issued by the United States Army Corps of Engineers (the Corps)[2] to Waste Management of Illinois (Waste Management) pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344 (CWA § 404). Currently before the Court are cross-motions for summary judgment and a motion to strike.

---

[1] Generally, this area is understood to be the metropolitan area east of St. Louis, Missouri. The Metro East is in Illinois.

[2] Col. Thomas E. O'Hara, Jr., is sued in his official capacity as the Commander of the Corps' Mississippi Valley District – St. Louis office. He and the United States Army Corps of Engineers will be referred to herein collectively as "the Corps."

## BACKGROUND

Since 1984, Waste Management has operated the Milam Recycling and Disposal Facility (Milam RDF) – in common parlance, a landfill – in Madison, Illinois. It provides disposal capacity to Madison, Monroe, and St. Clair Counties and to the St. Louis metropolitan area. Milam RDF is estimated to reach capacity in 2012. During its remaining landfill life, Milam RDF will require approximately 2,000,000 cubic yards of soil for daily, intermediate, and final cover. Although Milam RDF uses various Alternative Daily Cover as permitted when operationally possible, it still requires borrowing soil from another area. Waste Management owns over 200 acres of adjacent property located north of the Cahokia Canal, which discharges into the Mississippi River, and northeast of Milam RDF. Waste Management proposes to develop and operate a 180-acre expansion of the existing Milam RDF, to be referred to as North Milam, to provide 17 years of disposal capacity for general non-hazardous municipal solid waste; demolition, construction, and debris waste; asbestos waste; non-hazardous permitted special waste; and non-hazardous permitted liquid waste for solidification received from Bond, Clinton, Madison, Monroe, and St. Clair Counties in Illinois; from Franklin, Jefferson, Lincoln, St. Charles, St. Louis, Warren, and Washington Counties in Missouri; and from the City of St. Louis, Missouri. The "waste disposal footprint" will encompass approximately 119 acres of the 180-acre expansion. Waste Management's ultimate plan has two phases: immediate excavation of cover soil to be used at the existing Milam RDF and later construction of a landfill at the North Milam site. Importantly, neither phase is dependent on the other; excavation for soil cover is necessary to support the existing Milam RDF regardless of whether the North Milam site is used as a landfill. (Joint Appendix (JA) 107-08, 174-75, 213, 231, 1741, 1843).

On March 25, 2005, Waste Management submitted a joint application to the Corps for a CWA § 404 permit and to the Illinois Environmental Protection Agency (the IEPA) for a permit pursuant to Section 401 of the CWA, 33 U.S.C. § 1341 (CWA § 401).  The application described the proposed project as "future excavation activities in conjunction with operations at the Milam Recycling and Disposal Facility" (JA 107).  A CWA § 404 permit is required for the discharge of dredged or fill material into navigable waters, including certain wetlands.  33 U.S.C. §§ 1344(a), 1362(7); 40 C.F.R. § 230.3(s)(7).  A CWA § 401 permit, also referred to as a water quality certification, is a certification from the state that a discharge into navigable waters occurring in the state will comply with applicable water quality standards.  33 U.S.C. § 1341(a)(1).  Waste Management was first required to obtain a § 401 permit from the IEPA before it could obtain a § 404 permit from the Corps.  For purposes of this case, the IEPA is concerned with water quality standards; the Corps is concerned with any impact on wetlands.

On June 30, 2005, the Corps issued a public notice concerning Waste Management's application for a CWA § 404 permit.  The notice contains the following project description.

> A 222 acre parcel of vacant land, to be called North Milam, approximately 1 mile north of the existing Milam RDF is proposed to be utilized in conjunction with daily activities at the Milam RDF.  The RDF has been in operation for over 2 decades and requires large amounts of soil for cover daily.  Movement of soil from North Milam to RDF can be accomplished with no truck travel over public highways and a haul distance of less than 1 mile.
>
> North Milam may also be used for RDF activities other than as a borrow area in the future as well, given its close proximity to the existing facility.  The proposal includes utilization of the soil from the 222 acre site by excavations and removal of these materials.  Approximately **18.4 acres** of wetlands will be impacted; **9.9 acres** of forested and scrub/shrub wetlands and **8.5 acres** of farmed wetlands.  Approximately **8.4 acres** of wetlands will be avoided and preserved without impacts.

(JA 85-86) (emphasis in original).  The notice explains the Corps' authority to issue or deny the

permit under CWA § 404 "for discharge of dredged or fill material into waters of the United States" (JA 86). On September 2, 2005, Waste Management responded to public comments compiled and submitted by the Corps and explained, as background for the project, Milam RDF's need for cover soil during the remaining landfill life. Waste Management further explained that because Milam RDF has 7 to 10 years of site life remaining, "any speculation about future uses of the subject property after Milam closes is not warranted at this time" and pointed out that local siting approval and IEPA permitting would be required by law "[i]f a landfill were to be proposed in the future." (JA 1843, 1845).

In August 2005, the United States Environmental Protection Agency (EPA) submitted comments to the Corps objecting to Waste Management's § 404 permit application on the grounds that (1) the Corps' public notice lacked important details about the wetland impacts and the proposed mitigation for the project, (2) placement of the mitigation at an offsite location within the watershed is in the public's best interest, and (3) the proposed mitigation plan is deficient. On these bases, the EPA recommended that the permit application "as proposed" be denied. (JA 1696-97). Thereafter, Waste Management submitted additional information to the Corps and revised its mitigation plan for the project to include, among other things, a five-year management and monitoring period for the mitigation area (*see* JA 100, 173, 178).

On July 5, 2006, the IEPA issued a public notice and fact sheet concerning Waste Management's application for a CWA § 401 certification. The notice describes the project as "[e]xcavation and removal of soil for cover material at Milam Recycling and Disposal Facility" (JA 1738). The fact sheet describes the project in more detail.

> The proposed project site, to be called North Milam, is proposed to be used in conjunction with daily activities at the Milam RDF. The proposed project will

> excavate and remove soil from the North Milam site for use at the Milam RDF. The Milam RDF has been in operation for over 2 decades and requires large amounts of soil for cover daily. Movement of soil from the North Milam site to the Milam RDF can be accomplished with no truck travel over public highways and a haul distance of less than 1 mile. Five wetlands totaling 26.8 acres of wetlands are located on the project site. The borrow activities will impact approximately 18.4 acres of the wetlands. The remaining 8.4 acres will be avoided and incorporated in the mitigation plan for the site. Of the wetlands affects by the borrow activities, approximately 9.9 acres of forested and scrub/shrub wetlands and 8.5 acres of farmed wetlands will be impacted. Mitigation for the impacts is proposed to be on the north side of the site and on the adjacent property and will incorporate the remaining wetlands. Mitigation for other projects by the applicant has already been constructed on the adjacent property. … All of the mitigation areas will be placed in a permanent conservation easement and deeded to Madison County.

(JA 1739). The fact sheet describes the project's purpose and anticipated benefits as allowing "the construction of a borrow area to generate necessary soil cover for the existing Milam RDF providing continued waste management for the community as well as economic and employment opportunities for the community" (JA 1741). The IEPA responded to comments submitted by Prairie Rivers Network, ABC, North American Butterfly Association, Webster Groves Nature Study Society, and Sierra Club (JA 1755-82).

The IEPA issued its § 401 certification to Waste Management on November 30, 2006. In the certification, the IEPA describes the project as "the excavation of wetlands in conjunction with providing soil for daily cover of a landfill" (JA 81). By its terms, the certification becomes effective when the Corps includes the conditions required by the IEPA as conditions of the requested CWA § 404 permit (JA 83).

Effective March 3, 2008, the Corps issued its § 404 permit to Waste Management, authorizing "placement of fill material into waters of the United States in conjunction with the construction of the North Milam Recycling and Disposal Facility (RDF) to be located just north of the existing Milam RDF in wetlands adjacent to Cahokia Canal near Madison, Madison County,

Illinois." The permit includes seven special conditions and incorporates the conditions required by the IEPA. (JA 29-36). The Corps' Permit Evaluation, Environmental Assessment, and Decision Document dated February 27, 2008, describes the purpose for the project as providing "cover for the existing Milam Landfill Recycling and Disposal Facility and possibly utiliz[ing] the borrow area for an expanded landfill to be called North Milam RDF" and describes the need "for another landfill as well as cover for the existing landfill [as] paramount" (JA 52). On September 22, 2009, the § 404 permit was modified to include an eighth special condition that "no tree clearing will be conducted from April 1 through September 30 without prior written approval from the US Fish and Wildlife Service and US Army Corps of Engineers, Regulatory Branch, in order to avoid potential impacts to Indiana Bats" (JA 15-22). All other terms and conditions of the original permit remained unchanged.

The crux of ABC's complaint is that the Corps violated the CWA by issuing a permit authorizing placement of fill material into navigable waters in conjunction with the construction of a landfill without the IEPA having issued a § 401 certification covering construction of a landfill. In other words, the § 404 permit issued by the Corps improperly covers broader conduct than the § 401 certification issued by the IEPA. ABC contends that Waste Management cannot construct a landfill at the North Milam site because it lacks the necessary permits from the IEPA,[3] and Waste Management cannot destroy wetlands at the North Milam site for the purpose of obtaining daily cover for the existing Milam RDF because the § 404 permit does not authorize that activity.

ABC asserts 6 "claims for relief" in its complaint. First, ABC alleges that the Corps'

---

[3] At the time the Court heard oral argument in this case in June 2010, such permits were pending.

decision to issue the § 404 permit for the construction of a landfill at the North Milam site in the absence of a § 401 certification from the IEPA regarding the water quality impacts of constructing a landfill at that site was arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).  Second, ABC alleges that the Corps failed to properly consider the North Milam site to be in a 100-year flood plain and, consequently, its decision to issue the permit was arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).  Third, ABC alleges that the Corps' environmental assessment was incomplete; it failed to determine that the environmental impacts were significant, which would have required preparation of an environmental impact statement under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C); and, consequently, the decision to issue the permit without satisfying its obligations under the NEPA was arbitrary, capricious, an abuse of discretion, and not in accordance with the law under the APA, 5 U.S.C. § 706(2)(A).  Fourth, ABC alleges that the Corps' decision to issue the permit for the destruction of wetlands to construct the proposed North Milam landfill was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law under the APA, 5 U.S.C. § 706(2)(A), because (1) the Corps failed to identify and evaluate any alternative sites for the construction of a new landfill and (2) the Corps failed to overcome the presumption that sites not involving wetlands are available for the construction of a new landfill.  Fifth, ABC alleges that the Corps was required under the NEPA to identify and analyze alternative sites involving lesser environmental impacts for the construction of the proposed new North Milam landfill and that its decision to issue the permit without doing so was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law under the APA, 5 U.S.C. § 706(2)(A).  ABC's sixth claim, which involves the impacts of constructing the proposed

North Milam landfill on the endangered Indiana Bat, was rendered moot by the modification to the permit in September 2009; consequently, ABC voluntarily dismissed this claim pursuant to a joint stipulation filed on December 19, 2009. ABC seeks broad declaratory and injunctive relief against the Corps and Waste Management, with costs and attorneys fees.

## ANALYSIS

This Court's analysis begins and ends with Waste Management's standing argument. Article III standing is jurisdictional. Therefore, the Court must address whether a case or controversy exists before addressing the merits of the case. The fact that the Corps "does not challenge Plaintiff's standing" (Doc. 41 at p. 2 n.2) does not affect this Court's obligation to determine whether a case or controversy vests this Court with jurisdiction. *See generally Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 738-39 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 1890 (2010).

Constitutional standing contains three elements.

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly … traceable to the challenged action of the defendant, and not … the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted). A "particularized" injury is one that affects the plaintiff "in a personal and individual way." *Id*. at 560 n.1. "An organization has standing when any of its members has standing, the lawsuit involves interests 'germane to the organization's purpose,' and neither the claim asserted nor the relief requested requires an individual to participate in the lawsuit." *Pollack*, 577 F.3d at 739, *quoting Sierra Club v. Franklin County Power of Ill., LLC*, 546 F.3d 918, 924 (7th Cir. 2008),

*cert. denied*, 129 S. Ct. 2866 (2009). The party invoking federal jurisdiction – in this case, ABC – bears the burden of establishing these elements. *See Lujan*, 504 U.S. at 561; *see also Pollack*, 577 F.3d at 739.

To establish standing, ABC submitted affidavits from three of its members: Kathy Andria, who is President of ABC (Doc. 30-1); Mark Feldworth, who is a member of the Board of Directors of ABC (Doc. 30-2); and Yvonne Homeyer, who is a member of ABC, serves on the national board of the North American Butterfly Association (NABA), is the former president and current vice-president of the St. Louis Chapter of the NABA, and is the former president of the Webster Groves Nature Study Society (Doc. 30-3). Andria's affidavit concludes with the following statement: "Construction of the proposed North Milam landfill will have a negative impact on me and on other members of American Bottom Conservancy" (Doc. 30-1). Feldworth's affidavit similarly concludes: "Construction of the proposed North Milam landfill will have a very real negative impact on me" (Doc. 30-2). Homeyer's affidavit concludes: "Construction of the North Milam landfill will harm me by reducing my opportunities to watch and enjoy birds, butterflies, and other wildlife at Horseshoe Lake" (Doc. 30-3).

Waste Management argues that these members have not established actual or imminent injury because the Corps' § 404 permit does not authorize the construction of a landfill, and no landfill has been permitted on the North Milam site. ABC counters that the permit's broad language referencing construction of the North Milam RDF makes the members' injuries "fairly traceable" to the Corps' permitting decision. ABC relies on the facts that Waste Management has initiated the necessary permitting process with the IEPA to operate a landfill at the North Milam site and has pursued local siting approval through the City of Madison, Illinois, to show that its members'

injuries are actual and imminent.

Reviewing each of the affidavits, the Court finds that none of the three members has standing. Members Andria and Feldworth can be considered together. Both affidavits address construction of a *landfill* and the effects that a landfill would have on them, including the risk that the proposed landfill will be subject to a 100-year flood. As a matter of law, the Corps' § 404 permit does not authorize the construction of a landfill. That authority is granted exclusively to the IEPA under Title X of the Illinois Environmental Protection Act. 415 ILCS 5/39. The Corps' authority, under 33 U.S.C. § 1344, relates to activities involving discharges of dredged or fill material into navigable waters. Certainly, any construction of a landfill must comport with federal water pollution laws, but many other considerations factor into the decision, as well. *See* 415 ILCS 5/39. The Corps only is concerned with the effect on navigable waters. Moreover, the Administrator of the Federal Emergency Management Agency (the FEMA Director) is responsible for identifying and publishing information with respect to all flood plain areas. 42 U.S.C. § 4101(a)(1). This responsibility is consistent with the Director's obligations to coordinate national flood insurance with land-management programs. *See generally* 42 U.S.C. § 4101, *et seq.* There is nothing in the record to suggest that the FEMA Director has designated the North Milam site as being within a flood plain. This would be a different case – or at least the standing analysis would be different – if the IEPA already had granted the necessary permits for Waste Management to operate a landfill at the North Milam site. *Cf. Sierra Club*, 546 F.3d at 923 (finding that the environmental organization had standing to seek an injunction against a power company that had obtained a state permit to build a coal power plant in southern Illinois based on a member's repeated vacationing on a lake three miles from the proposed site). But the requirements of standing must be established at the time suit is

filed. *Pollack*, 577 F.3d at 742 n.2. Because Andria's and Feldworth's affidavits establish neither injury in fact nor a causal connection between any purported injury and the issuance of the § 404 permit, these members do not create standing for ABC.

Member Homeyer's affidavit requires additional analysis, although she also complains primarily about the effects of constructing a landfill. She also mentions "[d]estruction of wetlands" and "[h]abitat destruction" – albeit she mentions these in the context of a landfill – and states that there "are birds and butterflies using the 200 acres in question right now" (Doc. 30-3). The Court considers whether these concerns constitute actual and imminent injury to Homeyer as a result of the borrow activity permitted to take place at the North Milam site.[4] It is important to keep in mind that the Corps' § 404 permit relates to 26.8 acres of wetlands – only 18.4 acres of which will be impacted. Approximately 8.4 acres of wetlands will be avoided and preserved without impacts. The wetland mitigation plan includes creating an additional 36.55 acres on adjacent property. For reasons set forth above with respect to Members Andria and Feldworth, the Court's inquiry is limited to the destruction of wetlands for the purpose of obtaining daily cover. Under applicable law, the Corps does not authorize construction of a landfill. As confirmed by counsel for the Corps during the hearing, there is no difference – for the Corps' § 404 purposes – in whether the wetlands are being impacted for the immediate purpose of obtaining daily cover soil or for the purpose of constructing a landfill. Once the wetlands are impacted and new wetlands are created in mitigation, any analysis into the impact on those original wetlands becomes a moot point.

Reading her affidavit liberally, Homeyer alleges that the destruction of wetlands will reduce

---

[4]The Court recognizes that ABC contests whether the § 404 permit authorizes borrow activity. By referring to it as a "permitted activity," the Court does not imply a finding on the merits of this claim.

the number and variety of birds, butterflies, other insects, snakes, and amphibians that she frequently observes around Horseshoe Lake.[5] But this injury is merely speculative. Her anticipated injury disregards the fact that 31% of the subject wetlands will be avoided and preserved and that nearly twice the amount of affected wetlands will be created in mitigation. Homeyer attacks the mitigation plan because it "is not possible to create an entire ecosystem by creating a pond or planting trees elsewhere" (Doc. 30-3). She contends that butterflies need host plants particular to each species; that "[i]f those host plants are not available at the mitigation site, the butterfly cannot reproduce;" and that butterflies need "nectar sources (flowers)" (*Id.*, emphasis added). Homeyer has not shown a concrete injury. In *Sierra Club v. Franklin County Power of Illinois*, the Court of Appeals recognized an injury because it was certain that the power plant would release some pollutants, although the ultimate magnitude was unknown, and the plaintiff stated that she would stop taking her trips if the power plant was built. 577 F.3d at 925, 927. By contrast, Homeyer has not stated that she will stop visiting Horseshoe Lake if the wetlands are destroyed as proposed, and her concern for the effects on the habitat is too generalized to give rise to standing. *See Pollack*, 577 F.3d at 741-42.

Because ABC has not established that any of its members have standing, ABC lacks constitutional standing to bring this action. The Court, therefore, lacks jurisdiction to resolve the claims asserted by ABC. The proper forum for ABC's challenge to construction of a landfill at the North Milam site is at the administrative level. It became clear during the hearing that ABC is actively involved in the ongoing permitting process before the IEPA, and the record reflects that

---

[5] Apparently, the current habitat is not affected by its close proximity to the existing Milam RDF.

ABC filed an appeal of the City of Madison's siting approval (JA 1873). This Court simply lacks the power to decide ABC's claims.

## CONCLUSION

For the foregoing reasons, the Court finds that ABC, through its members, lacks standing to assert these claims. Waste Management's motion for summary judgment (Doc. 38) is **GRANTED**, and this action is **DISMISSED without prejudice** for lack of subject matter jurisdiction. The Clerk of Court is **DIRECTED** to enter judgment accordingly. The motions for summary judgment filed by ABC and the Corps (Docs. 30 and 35, respectively) and the motion to strike (Doc. 37) are **DENIED as moot**.

**IT IS SO ORDERED.**

DATED: 09/30/10

s/ *G. Patrick Murphy*
G. PATRICK MURPHY
United States District Judge